**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JEFFREY S. WRAGE**
Blachly Tabor Bozik & Hartman, LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JANINE STECK HUFFMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES NEWMAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1206-EX-466 |
| | ) | |
| REVIEW BOARD OF THE INDIANA | ) | |
| DEPARTMENT OF WORKFORCE | ) | |
| DEVELOPMENT and GAGAN LLC, | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE REVIEW BOARD OF THE INDIANA
DEPARTMENT OF WORKFORCE DEVELOPMENT
The Honorable Steven F. Bier, Chairperson
Cause No. 12-R-1425

**February 6, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

James Newman ("Newman") appeals a decision by the Review Board of the Indiana Department of Workforce Development (the "Board") denying his claim for unemployment benefits following the termination of his employment with Gagan LLC ("Employer," and together with the Board, "Appellees"). Newman raises three issues which we consolidate and restate as whether the Board erred in concluding that Newman was terminated for just cause. We affirm.

The relevant facts follow. Employer, which is owned by James Gagan ("James"), operates a wholesale club where club members have access to manufacturer catalogs. Laurie Gagan ("Laurie") worked for Employer as a manager and was a salaried employee. Newman was initially hired by Employer in May 2010 as an accounting business analyst. In January 2011, Newman began a leave of absence. The accounting position held by Newman was eliminated in May 2011. On June 21, 2011, Newman returned to work for Employer, but in a different position as assistant marketing room manager as an hourly employee who would assist in the marketing room and perform outbound calling. After returning to work, Newman received disciplinary warnings related to his tardiness in arriving at work, the length of a break, and combative behavior. On June 28, 2011, Employer terminated Newman's employment, and Newman applied for unemployment benefits.

On August 26, 2011, a claims deputy issued a determination of eligibility finding that Newman was not discharged for just cause and was eligible for unemployment benefits. Employer appealed the deputy's determination. A hearing was initially held before an administrative law judge ("ALJ") on November 1, 2011, and the ALJ issued a

2

decision. On December 9, 2011, the Board entered an Order of Remand which stated that the Board reviewed the file, found that the ALJ handled Newman's exhibits improperly, vacated the ALJ's decision, and remanded for a hearing de novo before a different judge.

On January 6 and 20, 2012, telephonic hearings were held before a different ALJ at which the parties appeared and were represented by counsel, provided testimony, and presented exhibits. On January 20, 2012, the ALJ issued a decision which affirmed the deputy's initial August 26, 2011 determination that Newman was not discharged for just cause. Employer appealed, and on March 12, 2012, the Board entered an Order of Remand which found that a factual finding of the ALJ that there was no "consensus as to the number of disciplines that are to be issued prior to termination" was not supported by the record and that the ALJ failed to mark an exhibit offered by Employer and failed to indicate on the exhibit list that the document was offered but not admitted. Exhibits at 82. The Board remanded the matter to the ALJ to reconsider its findings and conclusions after reviewing certain testimony and to modify the exhibit list.

On April 2, 2012, the ALJ issued a corrected decision which affirmed the deputy's initial August 26, 2011 determination. In concluding that Employer presented insufficient evidence of just cause for discharge, the April 2, 2012 decision found that Employer's unwritten policy is to issue three disciplines and on the third warning to discharge the employee, that there was no notice to the employee of the written policy of termination upon a third warning, that there was insufficient evidence that Newman was placed on notice that his job was in jeopardy based upon a specific number of warnings prior to discharge, and that there was insufficient evidence that Employer has uniformly

3

enforced violations of the rules utilized to discharge Newman. Employer appealed the ALJ's decision to the Board.

After listening to the recording of the testimony before the ALJ and examining the documents in the record, the Board issued a decision on May 10, 2012, reversing the decision of the ALJ and finding that Newman was not entitled to unemployment benefits. The Board's conclusions provide in part:

> The Employer's policies regarding punctuality and conduct are rules, because the policies clearly define the employee's expected conduct – reporting to work on time and behaving in a professional manner. Furthermore, the rules are capable of uniform enforcement. The Employer's rules are reasonable, because an employer should reasonably expect its employees to arrive on time and to conduct themselves in a reasonable, professional manner. [Newman] was aware of the Employer's rules. [Newman] knowingly violated the rules, when he refused to relinquish his cell phone and loudly asked, "Are you rescinding your offer? Are you rescinding your offer?" on the showroom floor in front of customers and coworkers and when he continued to be late to work after receiving disciplinary warnings for his tardiness issues. The Employer uniformly enforces its policies by terminating all marketing room employees who receive three written warnings. [Newman] was aware that he could be discharged after three written warnings, as is evidenced by his e-mailed comments to [James] that he had received his third strike and expected to be terminated the next day. In this instance, [Newman] received leniency, because he was allowed to accumulate five written warnings during the week he worked in the marketing room before he was discharged. The Employer discharged [Newman] for just cause.

Appellant's Appendix at 4. Newman now appeals the Board's decision.

The issue is whether the Board erred in concluding that Newman was discharged from his employment with Employer for just cause. The standard of review on appeal of a decision of the Board is threefold: (1) findings of basic fact are reviewed for substantial evidence; (2) findings of mixed questions of law and fact—ultimate facts—are reviewed for reasonableness; and (3) legal propositions are reviewed for correctness. Recker v.

4

Review Bd. of Ind. Dep't of Workforce Dev., 958 N.E.2d 1136, 1139 (Ind. 2011) (citing McClain v. Review Bd. of Ind. Dep't of Workforce Dev., 693 N.E.2d 1314, 1318 (Ind. 1998), reh'g denied). Ultimate facts are facts that involve an inference or deduction based on the findings of basic fact. Id. (citing McClain, 693 N.E.2d at 1317). Where such facts are within the special competence of the Board, the Court will give greater deference to the Board's conclusions, broadening the scope of what can be considered reasonable. Id. (citing McClain, 693 N.E.2d at 1318).

In Indiana, an employee is ineligible for unemployment benefits if he or she is discharged for just cause. Stanrail Corp. v. Review Bd. of Dep't of Workforce Dev., 735 N.E.2d 1197, 1202 (Ind. Ct. App. 2000), trans. denied; Ind. Code § 22-4-15-1.[1] Ind. Code § 22-4-15-1(d) provides that "[d]ischarge for just cause" is defined to include a "knowing violation of a reasonable and uniformly enforced rule of an employer . . . ."

Newman contends that the Board erred in determining that Employer met its burden of proof that it discharged him for just cause because Newman's violations were not knowing, Employer's rules were not uniformly enforced, and the Board failed to adequately inquire into the reasonableness of the policy. Newman points to a statement in the rules distributed to employees providing that "[t]hese are guidelines subject to management discretion and enforcement and subject to change without notice" and

---

[1] Ind. Code § 22-4-15-1(a) provides in part:

[A]n individual who has voluntarily left the individual's most recent employment without good cause in connection with the work *or who was discharged from the individual's most recent employment for just cause* is ineligible for waiting period or benefit rights for the week in which the disqualifying separation occurred and until the individual has earned remuneration in employment equal to or exceeding the weekly benefit amount of the individual's claim in each of eight (8) weeks.

(Emphasis added).

argues that "[b]y its own terms, this statement vests in management discretion to enforce and change the rules without notice to employees" and that "[t]his discretion resulted in an unwritten policy of enforcement of which Newman was not aware." Appellant's Brief at 10. Newman argues that "as to the class determination, Employer's rules fail to provide a distinction between employees on any metric," that "[b]y its terms, the rules and policies must apply equally to all employees for the purposes of a uniform enforcement analysis," that Laurie was a member of management, that James testified that Laurie was exempt from the attendance requirements based upon the sentence providing management with discretion, and that "[t]his management discretion, especially considering its prevalence, creates an unwritten and unpublished policy that distinguishes employee attendance and discipline issues subject to any discretion solely determined by" James and Laurie. Id. at 11-12.

Newman further argues that the Board characterized the last two warnings as leniency, that the pertinent law does not contemplate leniency as an exception to uniform enforcement, and that rather the leniency is simply proof of the lack of uniform enforcement. Newman also asserts that the Board failed to adequately inquire into the reasonableness of the absence policy, that the fact that an employer may use a no-fault attendance policy does not overcome the statutory mandate to determine whether an employee's absenteeism is the result of circumstances beyond the employee's control under the totality of the circumstances, that the Board discussed the five written warnings that Newman received but notes the reason for tardiness for only two of the three warnings, that the Board failed to make the requisite finding in light of the fact that

6

termination was purportedly based on continuing tardiness, and that should this court fail to determine that Newman is entitled to compensation this court should remand to the Board for additional fact-finding with respect to the reasons for tardiness as required by statute.

Appellees maintain that the Board's decision should be affirmed and that Newman was discharged for just cause. Appellees argue that Employer's policies were known to Newman as he received copies of the written policies and procedures when he began his employment in May 2010 and the specific rules relevant to the marketing room in June 2011. Appellees argue that the sentence in Employer's policy stating that rules were subject to management discretion does not preclude a conclusion that the rules could be uniformly enforced, that Newman was aware of Employer's three strikes rule which would result in his termination, and that the Board appropriately concluded that Newman's violation of the rules resulted in his termination. Appellees argue that Employer properly met its burden that Newman was aware of the policies for which he was discharged on June 28, 2011, and that his continued tardiness and combative behavior were properly documented in five written warnings. Appellees further argue that Employer's rules were reasonable, that laws govern the timeframe during which marketing calls can be made, that the record established that Employer's policies are necessary because of federal telemarketing guidelines which require calls to be conducted only during specific periods of the day, and that the Board correctly determined that Employer's punctuality and conduct policies were reasonable. Appellees also argue that the Board correctly found that Employer's policies and rules were capable of uniform

enforcement, that Laurie was in a full-time management position and not a part-time hourly marketing employee, that Laurie had not violated any policies or rules, and that the purpose of the uniform enforcement and the unemployment compensation legislation was met.

In his reply brief, Newman argues that as a matter of law he could not have committed a knowing violation since Employer did not publish a policy governing its exercise of discretion as to disciplinary matters, that the case should be remanded because the Board failed to sufficiently address the reasonableness of Employer's policies, and that the Board did not determine that Employer uniformly enforced its polices.

The employer bears the initial burden of establishing that an employee was terminated for just cause. Coleman v. Review Bd. of Ind. Dep't of Workforce Dev., 905 N.E.2d 1015, 1019-1020 (Ind. Ct. App. 2009). To establish a *prima facie* case for just cause discharge for violation of an employer rule, the employer has to show that the claimant: (1) knowingly violated; (2) a reasonable; and (3) uniformly enforced rule. Id. at 1020; Stanrail, 735 N.E.2d at 1203. To have knowingly violated an employer's rules, the employee must: (1) know the rule; and (2) know his conduct violated the rule. Stanrail, 735 N.E.2d at 1203. If an employer meets this burden, the claimant must present evidence to rebut the employer's *prima facie* showing. Coleman, 905 N.E.2d at 1020; Stanrail, 735 N.E.2d at 1203.

A uniformly enforced rule is one that is carried out in such a way that all persons under the same conditions and in the same circumstances are treated alike. Gen. Motors Corp. v. Review Bd. of Ind. Dep't of Workforce Dev., 671 N.E.2d 493, 498 (Ind. Ct.

8

App. 1996). "In order to evaluate uniformity one must first define the class of persons against whom uniformity is measured." Stanrail, 735 N.E.2d at 1203. This court has often stated that "[a]n employer's asserted work rule must be reduced to writing and introduced into evidence to enable this court to fairly and reasonably review the determination that an employee was discharged for 'just cause' for the knowing violation of a rule." Id. at 1205 (citing KBI, Inc. v. Review Bd. of the Ind. Dep't of Workforce Dev., 656 N.E.2d 842, 844 (Ind. Ct. App 1995)); see also Doughty v. Review Bd. of Dep't of Workforce Dev., 784 N.E.2d 524, 527 (Ind. Ct. App. 2003) (citing Watterson v. Review Bd. of Ind. Dep't of Emp't & Training Serv., 568 N.E.2d 1102, 1105 (Ind. Ct. App. 1991) (stating that reducing a rule to writing and introducing it into evidence is "the minimum evidence necessary for the employer to satisfy its burden that it has a rule and that that rule is reasonable and uniformly enforced")). The reason for requiring uniform enforcement of a known and reasonable rule is to give notice to employees about what punishment they can reasonably anticipate if they violate the rule and to protect employees against arbitrary enforcement. Coleman, 905 N.E.2d at 1020.

On appeal from a denial of benefits, the claimant bears the burden of showing error. McCurdy v. Dep't of Emp't and Training Servs., 538 N.E.2d 277, 279 (Ind. Ct. App. 1989).

Here, evidence was presented that when Newman began his employment with Employer in May 2010 he received a Policies and Procedures book and acknowledged receipt of the book by providing his signature. The evidence shows that each policy or

9

procedure was set forth on a separate page of the book. The policies included the following:

**Reporting for Schedule**
Employees will report to work at their scheduled time, on time, and will be physically and mentally fit to perform their job responsibilities.

* * * * *

**Conduct**
All employees are to be courteous to one another. They shall be tactful in the performance of their job responsibilities, shall control their tempers and exercise the utmost patience and discretion, shall not engage in argumentative discussions, even in the face of extreme provocation. In the performance of their job responsibilities, employees shall not use coarse, violent, profane or insolent language or gestures, and shall not express any prejudice concerning race, religion, politics, national origin, life style or similar personal characteristics. Conversation between employees shall not be of ill intent such as the spreading of rumors or the defaming of one's character.

* * * * *

**Discipline**
Any violations of the directives of this manual or any violation of other department directives or requests will be grounds for initiating disciplinary procedures.

* * * * *

**Receiving Complaints**
No employee will harass, verbally abuse, or threaten any other employee or member. Complaints from members will be handled with a supportive and reassuring tone and with the utmost professionalism. Criticisms or directives from management will be accepted without argument in the constructive manor [sic] they are given. Directives shall be followed immediately or as the manager has requested.

* * * * *

**Disciplinary Action**

If a complaint is found to be sustained, disciplinary action will be taken. Discipline may be administered by the department managers. Such action may include, but will not necessarily be limited to:

- A. Verbal reprimand
- B. Written reprimand
- C. Suspension without pay
- D. Loss of privileges
- E. Lowering of a promotion
- F. Termination of employment

Exhibits at 42-46. Language at the bottom of each page setting forth the policies or procedures above stated: "These are guidelines subject to management discretion and enforcement and subject to change without notice. If you have questions, consult management." Id. The page of the book containing Newman's signature also contained the following language:

**Signature**

The Policies and Procedures book is designed to provide you with some of the policies affecting your employment here at [Employer]. You should read and comply with all the provisions of this book.

This book in no way includes every situation, but should be used as a guide for the normal day to day processes. [Employer] reserves the right to revise, supplement or rescind any policies or portion of this book from time to time as it deems appropriate. Employees will, of course, be notified of such changes to the policies as they occur.

I hereby acknowledge receipt of [Employer] "Policies and Procedures.["]  I understand it is part of my job to read, understand and comply with all the guidelines set forth in this book.

Id. at 47.

On June 21, 2011, when Newman returned to work and reported to Employer's marketing room, he was provided with a copy of the rules for that area which provided:

## RULES

11

1:    MUST BE ON TIME FOR WORK!  THAT MEANS TO HAVE YOUR BEVRAGE [sic], GO TO THE BATHROOM AND BE READY TO DIAL BY START TIME.

2:    15 MINUTE BREAK

3:    ABSOLUTELY NO ONE WILL BE OFF THE PHONE AT PRIME TIME 7:00 TO 8:30 NO EXCEPTIONS.

4:    EVERYONE IS RESPONSIBLE FOR THEIR OWN, SALE ADS, BREAK, DESKS AND **ATITUDE** [sic]

5:    EVERYONE MUST CONTACT ALL INVENTORIES 4 TIME [sic] DAY

6:    CELL PHONES MUST BE PUT IN JAR BEFORE YOU START WORK AND AFTER BREAK UNLESS PRE APPROVED BY LAURIE OR [the marketing room manager].

7:    NO FOOD IN MARKETROOM [sic] (LEAVE ALL LUNCHES IN KITCHEN)

IF ANY RULE IS BROKEN YOU WILL BE SENT HOME!!!!

Id. at 48.

During his testimony, James testified that Newman was not required to clock in while he held the accountant position because it was a salaried position and the company did not clock in salaried employees but that Newman's new position as a marketing room manager required him, like all marketing room employees, to clock in.  The marketing room manager testified that the marketing room rules were applied equally, that without the rules the marketing room did not function at all let alone at optimum ability, and that the typical progression for employees in the marketing room is that an employee would receive three warnings and then the employee's employment would be terminated.

Laurie indicated that "the standard progression [is] two warnings and then termination."

Transcript at 24.

> With respect to the marketing room rules, James testified:

> [W]e pay for lead generation programs. They're very expensive and we consider each lead inventory. The inventory has to be worked within forty-eight hours before it starts to go bad or in the sense of I guess our numbers reflect that, that anything over forty-eight hours it starts to degrade the quality of that lead. People lose interest. Because of the federal calling guidelines, we are required to, we are required to only call during a certain period of time and there are better times for us to call. So we try to work that inventory as efficiently as possible. Every minute that we lose costs us money and every time an employee shows up late or uses a cell phone or any of the other items on that list impacts their ability to be on the phone and, and to efficiently work that position and that lead that we paid for. When they violate those rules, it also costs the company money because it involves managers' time. We have to document things. We have to have conversations with the employees and it, all of it takes away from efficiency in the business, which was hurting at that time, still is.

Id. at 40.

The evidence shows that Newman received five written warnings from Employer between June 22 and June 28, 2011, the day Newman's employment was terminated. Each of the five written warnings received by Newman were entitled "REPORT OF EMPLOYEE GUIDANCE/DISCIPLINE," included the statement "SUPERVISOR'S REPORT OF CIRCUMSTANCES REQUIRING CORRECTIVE ACTION," and included information related to a description of the nature of the problem/situation, a summary of previous counseling or discipline, any comments given to the employee and the employee's response, a description of what the employee needed to do to improve, whether there was a mutual agreement between the supervisor and the employee, and whether there was a follow-up counseling session. See Exhibits at 49-59. In addition,

13

each of the five written warnings included a statement in bold at the bottom of the page which stated: "EMPLOYEE IS HEREBY ADVISED THAT FAILURE TO SHOW IMPROVEMENT MAY BE GROUNDS FOR DISCIPLINARY ACTION INCLUDING TERMINATION." See Exhibits at 49, 51, 54, 56, 59.

The evidence further shows that Laurie sent an e-mail message to Newman on June 20, 2011, informing him that he should arrive by 1:25 p.m. on June 21, 2011, so that he could be shown "how to finger print in" and indicating that training would begin that day and that they would discuss the policies of the marketing room. Exhibits at 75. Laurie testified that Newman "walked into the building approximately, well at one, 1:35 'cause we had been waiting for him since 1:25." Transcript at 23. Newman testified that he arrived at 1:37 p.m. Newman was verbally counseled about his tardiness. On June 22, 2011, Newman received a written warning related to his tardiness on June 21, 2011. The warning indicated that Newman "reported to work 10 minutes late on 6/21/11 without calling in advance to discuss any issues surrounding his late arrival," that June 21, 2011, was Newman's first day as a member of the marketing room, that Newman "indicated that his watch must be wrong," and that "[a]ll employees are expected to report to work on time and [Newman] shall do so as well." Exhibits at 49. The following sentence was handwritten on the discipline form: "After, I set my watch to [the marketing room manager's] so that it would not be a problem again." Id.

On June 22, 2011, Newman received a second written warning. In describing the nature of the problem/situation, the warning stated:

During training on 6/21/11 [Newman] was asked to remove his bag and place it in his office and to also place his cellular phone in the storage area

14

where all marketing room staff place their cellular phones while on the job. [Newman] initially refused to do either and became combative with Laurie [], raising his voice and repeatedly inquiring: "Are you rescinding my offer." This was done in the club in front of customers and other staff of [Employer].

Id. at 55. In describing what the employee needed to do to improve, the warning stated: "All employees, including [Newman], are expected to: follow procedures and policies of the company; use an appropriate tone with supervisors and managers; and follow reasonable direction provided by such managers and supervisors." Id.

On June 23, 2011, Newman received a third written warning because he reported to work one hour late. The warning stated that Newman indicated that he was having car issues. The warning further stated that all employees are expected to report to work on time and that Newman shall do so as well and indicated that there was mutual agreement between the supervisor and Newman to that statement. Newman was sent home for the day. During his testimony, when asked "[a]nd when [Newman] asked whether that was, that's my third strike, termination tomorrow, is that evident [sic] to you[r] knowledge on his part that the company policy is a three rule violation then termination," James answered affirmatively. Transcript at 41.

On June 28, 2011, Newman received two written warnings. One of the warnings, in describing the nature of the problem/situation, stated: "On 6/24/11, [Newman] took a 23 minute break. [Newman] has been previously instructed that breaks are to be 15 minutes in duration. Marketing room rules provide: '15 minute break.'" Exhibits at 58. The warning also stated that Newman had "been previously advised that all employees are expected to report to work on time and follow prescribed rules and policies." Id.

15

The other warning received on June 28, 2011, in describing the nature of the problem/situation, stated: "On 6/25/11, [Newman] logged into his computer ready to work subsequent to 9:30AM when he was scheduled to be logged in and ready to work. [Newman] has been previously instructed that he is to be logged into his computer ready to work at his scheduled start time each day." Id. at 53. In providing the comments of employee, the warning form stated that Newman "indicated that the time on the time clock was incorrect." Id. In describing what the employee needs to do to improve, the warning stated that Newman "has been previously advised that all employees are expected to report to work on time after arriving late to work on two prior occasions." Id. Employer discharged Newman on June 28, 2011.

The record reveals substantial evidence which demonstrates that Employer met its initial burden of establishing a *prima facie* case for just cause discharge for the reason that Newman knowingly violated reasonable and uniformly enforced rules of Employer related to punctuality or tardiness, the length of employee breaks, and prohibited conduct related to tactfulness and engaging in argumentative discussions.

To the extent Newman asserts that the evidence shows that Employer's policies were not applied to or enforced against Laurie and that the policies were thus not or incapable of being uniformly enforced, we note that Newman does not point to the record to show that she held a position similar to Newman's position in the marketing room or that she violated Employer's attendance or other rules and that the rules were not enforced. Further, Laurie was a manager and held a salaried position rather than an hourly position in the marketing room. James testified that he set Laurie's schedule and

16

that he had not observed any tardiness or attendance violations by Laurie. Testimony was presented that Newman was not required to clock in while he held the accountant position because it was a salaried position and the company did not clock in salaried employees and that Newman's new position in the marketing room required him, like all hourly marketing room employees, to clock in. James testified that Laurie was never an hourly employee of Employer and had never been required to clock in as the hourly employees were required to do. We cannot say based upon the record that Newman has demonstrated that Employer's rules as they were applied and enforced with respect to Laurie's employment resulted in the workplace policies of Employer not being uniformly enforced as applied to hourly employees or that the rules were incapable of being uniformly enforced.

To the extent Newman points to the language at the bottom of each page of the policies in the record which state that the "guidelines [are] subject to management discretion and enforcement and subject to change without notice" in support of his assertion that the rules were not uniformly enforced, we note that James testified that "[t]hese were rules that were posted and signed off on so there was no grey area for the employee and was to make it easier for them" and so that there would not be "any grey area in showing up on time, or not using a cell phone when your job is to be calling on our phone." Id. at 48. James testified "[t]hese are the types of things that have come up over the past few years and we post it so that there was clarity for our employees, and it is governed by . . . the position itself and in the rules book or the employee handbook where it states that management will give you direction and you're to follow it or be subject to

17

termination." Id. Newman does not show that other employees of the marketing room violated the written policies admitted into evidence and yet were not disciplined. Based upon the record, we cannot say that Newman has demonstrated that the phrase at the bottom of the rules pages referring to "management discretion" resulted in the workplace policies of Employer not being uniformly enforced as applied to hourly employees of the marketing room or that the rules were incapable of being uniformly enforced.

Also, to the extent Newman argues that Employer's attendance or punctuality policies do not adequately permit a determination of whether an employee's absenteeism is the result of circumstances beyond the employee's control, we note that, while Newman asserted that his late arrival at work on July 23, 2011 was due to having car issues, Newman does not point to evidence showing that all of the violations which were the subject of the written warnings issued by Employer were for reasons beyond his control. We cannot say that Newman has presented evidence, where Newman as the claimant bears the burden of showing error on appeal, to rebut Employer's *prima facie* showing that he was discharged for just cause on this basis.

With respect to Newman's argument that the Board failed to adequately inquire into the reasonableness of the policy, we note that James testified that it was important for employees working in the marketing room to be efficient, that federal rules governed the periods of time callers could call each lead inventory, that there were better times for the company to make calls, and that inefficiency in the marketing room costs the business money. The marketing room manager testified that the marketing room rules were applied equally and that without the rules the marketing room did not function at all let

18

alone at optimum ability. Also, Laurie testified that the marketing room rules were necessary because rules governed what times shifts could begin and end, that the leads were paid leads, that the company only had a certain timeframe that the leads could be called, that a marketing room employee "not showing up or . . . showing up late causes a lot of extra work for not only their co-workers, but for the marketing room manager to redistribute all of the paid leads so that we can call all of those leads . . . ," and that the rules promote the efficiency of the business. Id. at 24-25. We cannot say based upon the evidence before the ALJ and Board that Newman has demonstrated that Employer's workplace policies were unreasonable.

With respect to Newman's assertion that Employer's rule was not uniformly enforced because it did not immediately terminate his employment after he received a third warning and instead waited until after he received a fifth warning, we note that testimony was admitted that the marketing room rules were applied equally and that the typical progression for employees in the marketing room is that an employee would receive three warnings and then the employee's employment would be terminated. James indicated that the marketing room rules were uniformly enforced against all hourly marketing room employees. Newman indicated that he understood that his employment would be terminated following the receipt of his third warning in stating "that's my third strike, termination tomorrow" to James. See id. at 31. We cannot say under the circumstances presented in the record that the fact that Employer did not terminate Newman following the third written warning on June 23, 2011, and waited until June 28,

2011, to terminate Newman's employment dictates a finding that Employer's rules were not uniformly enforced.

In addition, even if Newman was the first employee to be terminated under the specific tardiness or other policies set forth in Employer's book, we note that the Indiana Supreme Court has stated:

> A policy that has not been the basis for termination of an employee in the past may nonetheless be "uniformly enforced" even if only one person is the subject of an enforcement action, so long as the purposes underlying uniform enforcement are met. Uniform enforcement gives notice to employees about what punishment they can reasonably anticipate if they violate the rule and it protects employees against arbitrary enforcement.

McClain, 693 N.E.2d at 1319. The purposes underlying uniform enforcement were met if, as the Board found, Newman knew of the violation, knew or could be fairly charged with knowledge that it could result in termination, and there was no arbitrary enforcement. These factual determinations are supported by substantial evidence presented at the hearing. See McClain, 693 N.E.2d at 1319-1320 (noting that the purposes were met as McClain knew of the violation, knew or could be fairly charged with knowledge that it could result in termination, and there was no arbitrary enforcement, and holding that those factual determinations were supported by substantial evidence).

Based upon the record, we conclude that there is substantial evidence supporting the Board's findings and conclusions that Employer demonstrated that Newman violated reasonable and uniformly enforced rules of Employer. Accordingly, Employer demonstrated just cause for discharging Newman, and we affirm the decision of the Board.

20

For the foregoing reasons, we affirm the decision of the Board.

Affirmed.

BAILEY, J., and VAIDIK, J., concur.